John FETTO, Plaintiff,

v.

Theodore SERGI, Commissioner of the Connecticut Department of Education, and Kristine D. Ragaglia, Commissioner of the Connecticut Department of Children and Families, Defendants.[1]

No. CIV.A.3:94CV771(CFD).

United States District Court, D. Connecticut.

Dec. 28, 2001.

---

1. When this action was first filed in 1994 it was captioned as *J.F., by his mother and next friend Mrs. F. v. Vincent Ferrandino, Commissioner of the Connecticut Department of Education, Rose Senatore, Commissioner of the Connecticut Department of Children and Families, and the West Haven Board of Education.* Since this case was first filed, however, several changes have occurred with respect to the named parties, resulting in the plaintiff changing the caption of the case, absent objection by the defendants, pursuant in part to Fed.R.Civ.P. 25(d). Specifically, Commissioners Ferrandino and Senatore have been replaced by Commissioners Sergi and Ragaglia, respectively; and J.F. is more than 18 years of age and has opted to be named as the sole plaintiff in this action. Further, pursuant to a settlement agreement, the West Haven Board of Education is no longer a party to this action.

Accordingly, the **CLERK IS ORDERED** to change the case name contained in the docket sheet to reflect the case name which appears on this ruling.

David C. Shaw, Law Offices of David C. Shaw, Hartford, CT, for plaintiff.

Richard J. Buturla, Marsha Belman Moses, Brian A. Lema, Gregory B. Ladewski, Michelle Claire Laubin, Berchem, Moses & Devlin, P.C., Milford, CT, for defendants.

## MEMORANDUM OF DECISION

DRONEY, District Judge.

This is an action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.;* § 504 of the Rehabilitation Act, 20 U.S.C. § 794; the Americans With Disabilities Act, 42 U.S.C. § 12132 ("ADA"); and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983. The plaintiff is a disabled individual who, while a student in the West Haven public schools, filed for administrative due process to challenge the individualized education plan formulated pursuant to the IDEA by his planning and placement team. Dissatisfied with certain decisions of the state hearing officer, the plaintiff brought this action against the West Haven Board of Education ("the Board"); Theodore Sergi, Commissioner of the Connecticut Department of Education ("the DOE"); and Kristine D. Ragaglia, Commissioner of the' Connecticut Department of Children and Families ("DCF"). The

plaintiff eventually reached a settlement with the Board, which is no longer a party.

The plaintiff alleges that the DOE violated the IDEA by: (1) failing to provide procedures that would have enabled him to pursue his IDEA claims against the DOE and other state agencies; and (2) failing to establish an interagency agreement or procedure with the DCF whereby certain services would be provided by the DCF to the plaintiff in school and at home. He also claims that the DOE violated the ADA by conditioning the availability of certain services on the plaintiff's placement in a school that exclusively services children with disabilities, rather than in one that offers a regular education environment.

The plaintiff claims that the DCF violated the IDEA by: (1) failing to establish procedures and provide him with certain related services under the IDEA in the community and in "the least restrictive environment;" (2) retaliating against the plaintiff for filing for administrative due process; and (3) failing to participate in planning and placement team meetings. The plaintiff further claims that the DCF's termination of benefits violated the Rehabilitation Act, and that its failing to provide certain services violated the ADA. He also makes various due process allegations against the DCF concerning the discontinuance of benefits.

According to the revised amended complaint ("the complaint"), dated October 15, 1999, the plaintiff seeks several forms of relief against the DOE and the DCF,[2] including the following:

(1) a reversal of the decision of the hearing officer to the extent that it denied the plaintiff certain individualized in-home services, referred to by the plaintiff as "wrap around" services;[3]

(2) an order directing the DCF to provide the "wrap around" services to the plaintiff in a regular education environment and at home;

(3) an order directing the DCF to provide the plaintiff compensatory services to make up for the lack of such "wrap around" services, including the period of time following the appeal of the termination of his benefits by DCF; and

(4) an order directing the DOE to establish various procedures to: (a) develop and implement individual educational plans allowing disabled students to remain in their regular educational environment, (b) provide students in an IDEA administrative action the ability to join in the action any state agency that may have the responsibility under the IDEA to provide educational services, and (c) ensure that students need not be transferred to a state facility in order to be provided with individualized education and treatment services.[4]

The parties tried the case to the Court for five days. At the conclusion of the trial the Court directed the parties to file proposed findings of fact and conclusions

2. In his complaint, the plaintiff does not explicitly allege whether this action was brought against the defendant commissioners in their official or individual capacities, or both. However, it is clear from a reading of the entire complaint that it was intended to be brought against them in the official capacities only.

3. The plaintiff uses the term "wrap around" services as equivalent to the "related services" under the IDEA, which are defined later in this opinion.

4. The plaintiff does not appear to request general damages under the ADA, Rehabilitation Act, or § 1983.

of law. Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact and conclusions of law.

## I. *Findings of Fact*

Based upon the testimony and other evidence presented at the trial, the Court finds the following facts:

### A. *Background Facts*

The plaintiff, John Fetto, was born on November 29, 1979. At nearly all times relevant to the complaint, he attended the West Haven public schools and received special education services there.

The Board classified the plaintiff as emotionally maladjusted and as suffering from several behavioral disorders. He has been diagnosed with, among other things, Attention Deficit–Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, and Dysthymia. The parties do not dispute that, in light of these conditions, the plaintiff was a student with serious emotional problems in need of special education and related services under the IDEA.

While in the West Haven public school system, the plaintiff was given annual behavioral objectives in the form of individualized education plans ("IEPs") which were formulated each year by a planning and placement team ("PPT"). The plaintiff's PPT met regularly to discuss the plaintiff's educational progress and difficulties. The plaintiff's mother, Sheila Fetto, and occasionally the plaintiff, attended these meetings.

During the 1992–93 school year, the plaintiff experienced several behavioral difficulties, which eventually led to hospitalization at Elmcrest[5] and an extended evaluation by the Child and Adolescent Psychiatric Service at Mount Sinai Hospital in Hartford.

On May 24, 1993, Mrs. Fetto attended a PPT meeting during which the plaintiff's IEP for the 1993–94 school year was formulated. It recommended an out-of-district placement in a day program at one of three area schools.[6] The plaintiff's family objected to this suggestion, and Mrs. Fetto instead requested that the Board provide what she termed "wrap around" services to obviate the need for the suggested placements.[7] The Board first suggested that she contact the DCF.[8] In addition, the possibility of the Board providing social work services and counseling was discussed, but no conclusion was reached. Thereafter, Mrs. Fetto applied to the DCF's Non–Committed Treatment Program ("NCTP"), described in more detail in Section I.B.

The plaintiff's parents did not agree to the IEP and instead requested a due process hearing pursuant to the IDEA and Connecticut law, though during an August 22, 1993 meeting the PPT withdrew its recommendation for out-of-district place-

---

5. Elmcrest, a facility in Clinton, Connecticut, contracts with local school districts to provide special education and related services to disabled students. *See A.W. v. Marlborough Co.,* 25 F.Supp.2d 27, 29 (D.Conn.1998).

6. The schools were the Klingberg School, the Wheeler Clinic School, and the Cedarhurst School. Representatives from Mount Sinai Hospital, who were present at the meeting, suggested that residential placement was appropriate for the plaintiff.

7. In requesting "wrap around" services, Mrs. Fetto meant "a comprehensive, consistent set of services, in school, in the community, and at home, which would provide behavioral management and other services which would permit plaintiff to benefit from education." (Pl.'s Post–Hearing Memo, ¶ 15).

8. At that time, the DCF was known as the Department of Youth and Family Services.

ment and agreed to place the plaintiff in the West Haven public schools with full-time paraprofessional support and behavior modification programs. As a result, the scope of related services under the IDEA-or "wrap around services," as the plaintiff characterizes them-became the principal focus of the due process hearing.

The due process hearing began on October 8, 1993, and was held over the course of six days. During the hearing, the hearing officer dismissed the DCF as a party and declined to join the DOE as a party over the plaintiff's objections. This left the Board as the sole defendant. The hearing officer also issued an interim order which provided some of the relief sought by the plaintiffs, including a full-time paraprofessional (which apparently had not yet been provided), an individual to assist the plaintiff in getting ready for school in the morning, and family counseling services.[9] She ruled that certain other forms of relief-the so-called "wrap around" services-such as the hiring of a mentor, were not related services that must be provided under the IDEA.

The hearing officer issued a final decision on March 30, 1994, which held that the plaintiff required "a highly structured, individualized special education program." She found that "the Board's current IEP and placement in regular classes with full paraprofessional support is an appropriate program in the least restrictive environment," but only provided that the plaintiff did not become a danger to himself or to others. While she continued some of the services she had ordered in the interim, the hearing officer also found that several of the "wrap around" services requested by the plaintiff were not educational sup-

port services, and thus the Board was not required to provide them. In particular, she ruled that "[t]he Board is not responsible for providing respite care in the home, or programs in the community such as a mentor for J."

The plaintiff filed this action appealing the decision of the hearing officer on May 11, 1994. From 1994 to 1997, the DCF provided many services to the plaintiff, including some that were ordered to be provided by the Board to the plaintiff in the hearing officer's interim and final decision. During this same period, the Board did not provide many additional services to him outside the school.

On July 1, 1999, the plaintiff reached a settlement with the Board with respect to another IEP. As a result of that settlement, the Board agreed to provide the plaintiff with educational services through the Area Cooperative Educational Services ("ACES") Adolescent Transitional Services program from September 30, 1999 until September 30, 2000, and also agreed to provide the plaintiff with counseling services. In October 1999, the Board and the plaintiff entered into a second settlement agreement which superceded the first. The second agreement pertained to the claims made against the Board in the instant action, including the 1993 IEP challenged by the plaintiff at the due process hearing. As a result of the settlement, the Board was voluntarily dismissed from this action. The contents of these settlement agreements are under seal.

### B. *Facts Relating to the DCF*

The DCF provided the NCTP until

---

**9.** Other than this order, the plaintiff remained in his current educational placement, though it is unclear whether this happened pursuant to the "stay-put" provision of the IDEA, *see*

20 U.S.C. § 1415(e)(2), or whether it was the result of the fact that the Board was no longer pursuing an out-of-district placement.

1996.[10] Under that program, the DCF funded residential care for children with psychiatric disorders who were not legally committed to its care and whose parents had not surrendered custody of them. Although the NCTP was not originally designed to provide home and community-based services, in the early to mid 1990's, the DCF provided such services in the community for some children in the early to mid 1990's, including the plaintiff.

On October 14, 1993, the DCF assigned a social worker to the plaintiff's case, five days after the due process hearing began on October 8, 1993. Although services did not commence until March 1994, the DCF began to organize programs for the plaintiff in October 1993. This is evidenced by an October 28, 1993 letter from Letitia Lacomba, a social work supervisor with the DCF, to Peter Florio, the pupil personnel director for the West Haven Board of Education, as well as a December 2, 1993 memo from Ms. Lacomba to Ralph Arnone, a DCF program supervisor and DCF's Case Activity Notes. The latter states, "It is this Department's position at this time to proceed in arranging for 'wrap-around services' for the time periods occurring before and after school. This Department will pay for these services at this time and seek reimbursement at a later date." Bruce Garrison, the family's advocate, testified that after a December 12, 1993 meeting with DCF staff and a community provider of services, he and the Fettos felt that there were no major obstacles to getting to the services requested from DCF. Before the hearing officer's decision, DCF made referrals to an outside agency, Priority Care, and began to provide some services.

Over the next four years, the DCF provided various services to the plaintiff. It sent workers to attend meetings with the plaintiff's family, provided a home health aide for the plaintiff, paid for a counselor, provided two mentors for the plaintiff, paid for a family therapist, offered a monitoring service for the plaintiff's medication, and paid for the plaintiff's membership at the YMCA. The DCF declined to provide payment for some services requested by the plaintiff, including a neurological examination, a sleep disorder evaluation, and employment of an independent case manager.

At various times, the DCF modified its program to address the needs of the plaintiff. For example, medical monitoring was added to his program when it was requested by the plaintiff's mother. Mentoring and counseling activities were tailored to meet the needs of the plaintiff and his family. This was accomplished, in part, through meetings of a family planning group.

On October 30, 1996, the DCF completed a Family Treatment Plan for the Fettos, which analyzed their situation, set forth goals for the family, and outlined the services to be provided in the coming six months. On January 22, 1997, however, the DCF sent the Fettos a Notice of Proposed Discontinuance of DCF Benefits. That notice gave two reasons for the discontinuation of benefits: the family's failure to cooperate with the DCF, and the fact that the services being provided by DCF were available from other sources. The notice also explained that the Fettos could request "a fair hearing" and that if they did so within ten days, benefits would be continued during the pendency of the hearing. At the Fettos' timely request, an administrative hearing pursuant to Conn. Gen.Stat. § 4–176e before the DCF Ad-

---

**10.** The NCTP has been replaced with the Voluntary Services program, which also allows families to receive services from the DCF without having their children legally committed to the agency.

ministrative Hearings Unit relating to DCF's services began in September 1997.[11] However, no services were provided by DCF after January 22, 1997. After receiving the notice, Mrs. Fetto told Curtis Harmon, the plaintiff's nurse psychotherapist, that she could not afford to pay for his services. According to Brian Behmke, the DCF's case manager for the region of the state where the plaintiff resided, no one at DCF ever notified Mr. Harmon or anyone else that he should discontinue services.

The administrative hearing was not completed when the trial in this case commenced. In that hearing, the plaintiff never raised the issue of discontinuation of services pending the completion of the hearing and decision.

Following the discontinuation of services, the DCF contacted the Clifford Beers Clinic, which is a facility receiving funding from the DCF that provides therapy services for low-income families on a sliding scale. The clinic agreed to provide such services for the plaintiff, but the plaintiff and his family apparently did not avail themselves of this opportunity.

After the DCF discontinued its NCTP-sponsored services in 1997, the plaintiff received some "related services" through the Board but their sufficiency is not challenged in this action.

### C. *Facts Relating to the DOE*

At all times relevant to the complaint, Connecticut had a federally-approved special education plan, entitled "State Plan for the Individuals with Disabilities Education Act Fiscal Years 1996–1998 Connecticut" (the "State Plan"). The State Plan describes how Connecticut allocates responsibility for special education and how the state discharges its responsibilities under the IDEA, other federal laws, and Connecticut state law.[12]

Pursuant to Section I of the State Plan, each local board of education is responsible for providing each school age child requiring special education and related services with a "free appropriate education." Unified school districts ("USDs") operated by the DCF, the Department of Corrections, and the Department of Mental Health and Addiction Services, are similarly responsible for children who receive educational services in one of their residential facilities.[13]

Section V of the State Plan describes the procedures to be followed if a child's parents and the local board of education disagree over the educational services the child should receive. Due process hearings are conducted by an impartial hearing officer appointed by the DOE. Under Connecticut's "single-tiered" due process system, the DOE has no authority to review decisions of the hearing officers.[14]

According to Section IX, the State Board of Education[15] is responsible for the development and supervision of the educational programs and services for all chil-

11. This is a state administrative appeal process separate from the IDEA.

12. The DOE has not provided the state plan for any other years relevant to the complaint. DOE official Theresa DeFrancis testified that the State Plan for the previous few years contained different language, but that the structure of special education services in the state was the same as that included in the 1996–1998 plan. (Trial Tr., Oct. 26, 1999, at 120–21.) Given that the plaintiff has not objected to the use of the 1996–1998 plan, the

Court will consider this version of the State Plan in reaching its decision in this case.

13. USD # 2 is operated by the DCF.

14. See Section II, *infra*, for a discussion of the appeals process for review of IEPs.

15. The DOE is the administrative arm of the State Board of Education. *See* State Plan at § IX.

dren requiring special education in the state.

Section XVII of the State Plan provides, An interagency agreement is not required to ensure that children and youth with disabilities are provided appropriate educational programs and services by LEAs [16]. *LEAs have primary responsibility under Connecticut state law and regulation to provide special education and related services to children and youth with disabilities.* Additionally, the unified school district[ ] operated by the department of children and families ... provide direct educational services to children requiring special education and are treated as LEAs for all purposes of the general statutes and regulations.

State Plan, § XVII (emphasis added).

## II *Conclusions of Law*

The Court makes the following conclusions of law: [17]

16. See *infra* note 20 for a definition of LEA, or local educational agency.

17. Certain additional facts found by the Court are included in this section as well.

18. The IDEA was amended on June 4, 1997. *See* Individuals with Disabilities Education Act Amendments of 1997, § 1, Pub.L. No. 105–117, 111 Stat. 37 (1997). Most of these amendments became effective on the date of enactment, and they do not indicate that they are to apply retroactively. *See id.*, tit. II, § 201(a)(1). Here, the dispute arose and nearly all of the events of this case (including the hearing officer's decision) occurred before that date. Accordingly, the unamended federal and state statutes and regulations will be used for the purposes of this opinion. *See Cedar Rapids Cmty. Sch. Dist. v. Garret F.*, 526 U.S. 66, 68 n. 1, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999) (stating that references to the IDEA are to the version in effect when the dispute arose); *J.B. v. Killingly Board of Educ.*, 990 F.Supp. 57, 65 n. 4 (D.Conn.1997) (determining that any events occurring before the enactment date shall be governed by the unamended statute).

## A. *Claims under the IDEA* [18]

### 1. *The IDEA Generally*

Congress enacted the IDEA "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, [and] to assure that the rights of children with disabilities and their parents or guardians are protected." 20 U.S.C. § 1400(c) (West 1994); *see also Cedar Rapids*, 526 U.S. at 68, 119 S.Ct. 992; *Board of Educ. v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (interpreting the Education for All Handicapped Children Act ("EHA"), the IDEA's predecessor). A free and appropriate education is defined, in part, as a special education that includes so-called related services.[19] *See* 20 U.S.C. § 1401(a)(18); *M.C. v. Voluntown Board of Educ.*, 226 F.3d 60, 62 (2d Cir.2000). The

19. Related services include:

transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(a)(17); *see also Cedar Rapids*, 526 U.S. at 68 n. 1, 119 S.Ct. 992. In other words, related services are those "that enable a disabled child to remain in school during the day provide the student with 'the meaningful access to education that Congress envisioned.'" *Cedar Rapids*, 526 U.S. at 73, 119 S.Ct. 992 (quoting Irving *Independent School Dist. v. Tatro*, 468 U.S. 883, 891, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984)).

education provided must be "reasonably calculated to enable the child to receive educational benefits," though states are not required to maximize the potential of handicapped children. *Rowley,* 458 U.S. at 207 and n. 21, 102 S.Ct. 3034; *see also M.C.,* 226 F.3d at 62. In other words, "[a]n appropriate public education under IDEA is one that is likely to produce progress, not regression." *Walczak v. Florida Union Free School Dist.,* 142 F.3d 119, 130 (2d Cir.1998) (internal quotation omitted).

Congress provides federal funding to states that develop plans meeting these goals. *See* 20 U.S.C. § 1412. One of the prerequisites for the receipt of federal funds is that a state establish procedures to assure:

> [t]hat to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5); *see also* 34 C.F.R. §§ 300.132, 300.550(b). Although the statute itself does not use the term, this preference is known as the "least restrictive environment," or LRE, in the accompanying regulations. *See* 34 C.F.R. § 300.550–300.556. In addition, the state educational agency also is responsible for assuring that the requirements of the IDEA are carried out and that programs for children with disabilities administered within the state by the local educational agency as well as all programs administered by another state agency, meet the educational standards of the state educational agency. *See* 20 U.S.C. § 1412(6).[20]

Under the IDEA, the educational needs of a handicapped child and the services required to meet those needs must be memorialized annually in that child's IEP. *See* 20 U.S.C. § 1414(a)(5); *Walczak,* 142 F.3d at 122 (summarizing the contents of the IEP). IEPs are formulated based on the input of a school official qualified in special education, the child's teacher, the child's parents, and when appropriate, the child. *See* 20 U.S.C. § 1401(a)(20).[21] When parents are not satisfied with the IEP proposed for their child, they may file a complaint with the state educational agency; such complaints are resolved through an impartial due process hearing

**20.** State educational agency "means the State board of education or other agency or officer primarily responsible for the State supervision of public elementary and secondary schools...." 20 U.S.C. § 1401(a)(7). Local educational agency "means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, or other political subdivision of a State...." *Id.* § 1401(a)(8).

**21.** Under state law, the IEP is formulated by the child's PPT, which does not include the parents or the child, but the parents have the right to participate in PPT meetings under the IDEA. *See* Conn. State Reg. § 10–76a–1(p). The IEP must include: (1) a statement of the child's present levels of educational performance; (2) a statement of annual goals, including long and short-term objectives; (3) a statement of the specific educational services to be provided to the child; (4) a statement of the transition services needed by the child, where applicable; (5) the projected date on which the services will begin and their anticipated duration; and (6) objective criteria and evaluation procedures to be used to determine whether the instructional objectives are being achieved. *See* 20 U.S.C. § 1401(20).

conducted by either the local or state educational agency. *See* 20 U.S.C. § 1415(b), (c); *see also* Conn. Gen.Stat. § 10–76a *et seq.* (setting forth the procedural and substantive obligations of parents and educational agencies in the appeals process under state law). In Connecticut, the state educational agency conducts due process hearings, though the hearing officers appointed by the DOE are not employees of the DOE. *See* Conn. Gen.Stat. § 10–76h(c); *M.C. v. Voluntown Board of Educ.,* 178 F.R.D. 367, 370 (D.Conn.1998). Any party not satisfied with the decision of the hearing officer may bring a civil action in the Connecticut Superior Court or the U.S. District Court, as the plaintiff did here. *See* 20 U.S.C. § 1415(e).

Before the merits of the plaintiff's claims are discussed, the Court first must address whether the plaintiff has standing to pursue them.

### 2. *Standing*

As part of his IDEA claim, the plaintiff alleges that he was denied his right to be appropriately educated in a regular education environment because the DOE failed to develop or enter into an interagency agreement whereby "wrap around" services could have been better coordinated with the DCF. *See* Compl., ¶¶ 42–44. The DOE argues that the plaintiff has not satisfied the requirements of standing with respect to these claims because he was never actually removed from the regular education environment and thus "has not suffered the conduct that is alleged in paragraphs 42–44." (Def. Theodore Sergi's Post Trial Br. at 15.) In other words, the DOE claims that the plaintiff did not suffer any injury sufficient to confer standing under Article III.

 To satisfy the standing requirements of Article III of the United States Constitution, which are evaluated as of the

time the suit was filed, a plaintiff must allege: (1) that he has suffered an injury or threat of injury; (2) that the injury is fairly traceable to the action challenged; and (3) that the injury is likely to be redressed by the requested relief. *Heldman v. Sobol,* 962 F.2d 148, 154 (2d Cir. 1992) (citing cases). It is the burden of the "party who seeks the exercise of jurisdiction in his favor," *McNutt v. General Motors Acceptance Corp. of Indiana, Inc.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936), "clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Warth v. Seldin,* 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). However, "[w]hether or not [a] ... [p]laintiff[ ] produced evidence at trial sufficient to establish this alleged violation is the very heart of the matter in [his] case and does not implicate standing. Standing requires alleged misconduct, not proven misconduct. [I]t is inappropriate for the court to focus on the merits of the case when considering the issue of standing." *Pederson v. Louisiana State Univ.,* 213 F.3d 858, 870 (5th Cir. 2000) (citation omitted).

 The evidence shows that the plaintiff was in the West Haven public schools throughout most of his education. He was not removed from that education environment in 1993 when this dispute arose, either because of the IDEA's "stay-put" provision, which provides that a "child shall remain in the then current educational

placement" during the pendency of a due process hearing, *see* 20 U.S.C. § 1415(e)(3)(A), or because the Board did not pursue its initial recommendation that the plaintiff be educated out-of-district. When the plaintiff filed for administrative due process, his attorney indicated several issues to be resolved. These issues included whether the plaintiff was entitled to certain support services, including "wrap around" services, and whether he was entitled to placement in the public schools. Even if the Board decided not to pursue its initial recommendation that the plaintiff be placed out-of-district, a dispute remained over the "wrap around" services, and it is arguable that there was a threat that the Board might have decided to remove the plaintiff from the regular education environment if his behavior had become too disruptive.

To impose a requirement that plaintiffs must actually have been *removed* from the regular education environment to challenge an IEP would in effect deny the ability of plaintiffs to challenge IEPs that have not yet been put into effect. In other words, "[i]f the Court were to accept [the DOE's] argument, parents would never have standing to challenge the propriety of a proposed IEP in federal court because the program that was maintained during the pendency of their action would always be one that they had agreed to previously." *Essen v. Board of Educ.*, No. 92–CV–1164(FJS)(GJD), 1996 WL 191948, *4

(N.D.N.Y. April 15, 1996); *cf. Heldman,* 962 F.2d at 157 (holding that the plaintiff had a sufficient stake in the outcome to permit the court to consider the case where there was a threat of future denial of an impartial due process hearing). The result of such a rule would be that the "stay put" provision would necessarily undermine a plaintiff's standing to bring an action under the IDEA, an effect that could not have been intended. Thus, the fact that an IEP had been recommended and challenged by the plaintiff and his parents, as well as the fact that a dispute remained as to the provision of wrap-around services, is an alleged injury sufficient to satisfy the requirements of standing.[22]

Although the DOE does not challenge the causation and redressability elements of standing, the Court notes that these elements were also satisfied as of the time of the amended complaint. The plaintiff presented evidence to support the allegations that possible insufficiencies in his 1993–94 IEP and the hearing officer's decision were caused by the DOE's failure to enter into an interagency agreement with the DCF that would apply to children who were not enrolled in one of the schools that comprised a USD. In addition, he also presented evidence that injunctive relief would have redressed any injury that he suffered.[23] Accordingly, the plaintiff has standing to pursue his claims.

---

**22.** Further, Congress may create through the enactment of a statute, including the IDEA, the alleged violation of which constitutes an injury in fact. *See Heldman,* 962 F.2d at 154. Here, the plaintiff alleges that he did not receive a free and appropriate education within the meaning of the IDEA in the years following the due process hearing because he was not provided with certain needed "wrap around" services, and because the services he did receive from the DCF were inadequate because they were not properly coordinated

due to the lack of an interagency agreement. Thus, the plaintiff alleges and provides facts to support an alleged violation of his right to a free and appropriate education under the IDEA, a violation of which constitutes an injury for the purposes of the standing requirement.

**23.** The viability of the plaintiff's claims for injunctive relief are addressed in the section that follows.

### 3. *Mootness*

The DOE also argues that the plaintiff's claims are moot for several reasons: (1) he has aged out of the special education system; (2) the challenged IEP is no longer in effect; and (3) the plaintiff voluntarily withdrew from the West Haven school system when he began attending classes at ACES. The Court agrees that some of the plaintiff's claims for injunctive relief are now moot.

 Whereas standing is determined as of the time of the complaint, mootness is evaluated throughout the pendency of the litigation. *See United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980); *Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir. 2001) ("This case-or controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." (citation omitted)). "A case is moot, and accordingly the federal courts have no jurisdiction over the litigation when 'the parties lack a legally cognizable interest in the outcome.'" *Fox v. Board of Trustees of the State Univ. of New York,* 42 F.3d 135, 140 (2d Cir.1994) (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). In other words, the plaintiff must have a personal stake in the litigation. *Id.* For example, courts have held that students' claims for declaratory and injunctive relief against universities are mooted by the students' graduation. *See id.; Cook v. Colgate Univ.,* 992 F.2d 17, 19 (2d Cir.1993); *Alexander v. Yale Univ.,* 631 F.2d 178, 183 (2d Cir.1980). Further, "[a] case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will

recur." *Irish Lesbian and Gay Org. v. Giuliani,* 143 F.3d 638, 647 (2d Cir.1998). Here, the plaintiff requests that the Court order the DOE to provide certain procedures relating to so-called "wrap around" services, but the plaintiff is no longer able to take advantage of such relief. Under the IDEA, the responsibility of school districts ceases when children reach the age of 22. *See* 20 U.S.C. § 1412(2)(B). In this case, the plaintiff has reached this age and thus is no longer part of the state special education system. Therefore, there can be no live controversy between him and any party with respect to DOE procedures, and his claims for such relief are moot. *See Honig v. Doe,* 484 U.S. 305, 317–18, 108 S.Ct. 592, 98 L.Ed.2d 686 (holding that the case was moot as to 24 year old plaintiff because "whatever rights to state educational services he may yet have … would not govern the State's provision of those services").

Further, the "capable of repetition, yet evading review" exception to the mootness requirement is not applicable to his claims under the IDEA for injunctive relief. "In the absence of a class action, that exception is unavailable unless '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Cook,* 992 F.2d at 19–20 (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam)). *Cf. Van Wie,* 267 F.3d at 114 (holding that in the election context, in the absence of a class action, there must be a reasonable expectation that the same complaining party would encounter the challenged action in the future).[24] Here, given

---

24. While the original complaint in this case was styled as a class action, the operative complaint deleted all references to the class, though the relief sought against the DOE ap-

the plaintiff's age, there is no reasonable expectation that he would be subjected to the same action again, as he is no longer a part of the local or state special education system.[25]

■ The plaintiff also asks the DCF to provide him with compensatory educational services to make up for the insufficient education that he received while in the West Haven school system. Without yet addressing the merits of these claims, the Court concludes that a live controversy still exists as to this form of relief. See University of Texas v. Camenisch, 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (acknowledging that a controversy may remain live even though some issues have become moot); Ammond v. McGahn, 532 F.2d 325, 327 (3d Cir.1976) (same).

■ Authority for awarding relief in the form of compensatory education is found in the United States Supreme Court's decision in Burlington Sch. Comm. v. Massachusetts Dep't. of Educ., 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (decided under the EHA). In that case, the Court held that a district court may order school authorities to reimburse parents for their expenditures on private school education for a child if the court determines that such placement, rather than a proposed IEP, is proper under the Act. See id. at 369, 105 S.Ct. 1996. Since then, several courts have extended this holding to en-compass compensatory education services in addition to tuition reimbursement.[26] See, e.g., Burr v. Ambach, 863 F.2d 1071, 1078 (2d Cir.1988), vacated and remanded sub nom. Sobol v. Burr, 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560 (1989), re aff'd. on reconsideration, Burr v. Sobol, 888 F.2d 258 (1989); Pihl v. Mass. Dep't of Ed., 9 F.3d 184, 188–90 (1st Cir.1993); Mason v. Schenectady City Sch. Dist., 879 F.Supp. 215, 219 (N.D.N.Y.1993). If the plaintiff is able to show that he was entitled to services under the IDEA before the time that he reached his 22nd birthday, as the IDEA generally applies to children through their 21st year, such relief is generally available even when the plaintiff has aged out of the special education system.[27] See St. Johnsbury Academy v. D.H., 240 F.3d 163, 169 (2d Cir.2001); Pihl, 9 F.3d at 189; Sabatini v. Corning–Painted Post Area Sch. Dist., 78 F.Supp.2d 138, 146 (W.D.N.Y.1999). However, reimbursement in the form of compensatory education only is available to a claimant over the age of twenty-one when he has suffered "gross violations." Mrs. C. v. Wheaton, 916 F.2d 69, 75 (2d Cir.1990).

Accordingly, the only remaining relief that could be available to the plaintiff as to the DOE is the claim that the decision of the hearing officer should be reversed. The only claim remaining that relates to the DCF is that it be ordered to provide

pears to be relief that would be appropriate in a class action. Given that the plaintiff has clearly chosen not to pursue this case as a class action, the Court will not treat it as such.

25. There also is no claim that the defendant has voluntarily ceased the allegedly unlawful activity, which could provide the basis for another exception to the mootness requirement.

26. Such relief against state officials is not barred by the Eleventh Amendment because it is prospective. See Burr, 888 F.2d at 259; see also infra note 37. Further, 20 U.S.C. § 1403(a) provides: "A State shall not be immune under the eleventh amendment … from suit in Federal court for a violation of this chapter."

27. Here, although the plaintiff is currently 22 years old, the alleged deprivations all occurred well before he reached this age.

the plaintiff with compensatory educational services.

### 4. *Claims Against the DCF*

The plaintiff argues that the DCF was a local education agency for him under the IDEA and therefore should be held responsible for providing educational services that fully comply with the requirements of the Act. In particular, the plaintiff argues that because the DCF, rather than the Board, provided certain "wrap around" services to him, it should assure that those services —along with the other parts of his educational program-constitute a "free and appropriate education" under the IDEA. The DCF maintains that this responsibility lies with the West Haven Board of Education because it did not function as the LEA for the plaintiff, even though it did provide him with services that might otherwise qualify as "related services" under the IDEA.

The IDEA contains several provisions establishing the role of agencies (other than the state educational agency) in providing educational services. For instance, it provides, in part, that:

> Any State meeting eligibility requirements ... and desiring to participate in the program ... shall submit to the Secretary, through its State educational agency, a State plan ... [that] shall—

. . .

> (13) set forth policies and procedures for developing and implementing interagency agreements between the State educational agency and other appropriate State and local agencies to—

> (A) define the financial responsibility of each agency for providing children with disabilities and youth with free appropriate public education, and

> (B) resolve interagency disputes, including procedures under which local educational agencies may initiate proceedings under the agreement in order to secure reimbursement from other agencies or otherwise implement the provisions of the agreement[.]

20 U.S.C. § 1413(a); *see also* 34 C.F.R. § 300.152. Further, the duty of the state educational agency to comply with the IDEA does not "limit the responsibility of agencies other than educational agencies in a State from providing or paying for some or all of the costs of a free appropriate public education." *See* 20 U.S.C. § 1412(6).[28]

In Connecticut, the State Plan includes interagency agreements between the DOE and the DCF, and between the DOE and the Department of Mental Health.[29] Those agreements set forth the circumstances under which the contracting state

---

**28.** In amending the IDEA in 1997, Congress elaborated on this purpose, stating that:

> A provision is added to the Act to strengthen the obligation to ensure that all services necessary to ensure a free appropriate public education are provided through the coordination of public educational and noneducational programs. This subsection is meant to reinforce two important principles: (1) that the State agency or LEA responsible for developing a child's IEP can look to noneducational agencies, such as Medicaid, to pay for or provide those services they (the noneducational agencies) are otherwise responsible for; and (2) that the

> State agency or LEA remains responsible for ensuring that children receive all the services described in their IEP's in a timely fashion, regardless of whether another agency will ultimately pay for the services.

S. Rep. No. 105–17, at 12 (1997).

**29.** Appendix J to the State Plan includes the interagency agreement between the DOE and the DCF for children in the DCF facilities and certain children in private facilities, in other words, children within the jurisdiction of the so-called USD # 2. Similarly, Appendix N includes the interagency agreement between the DOE and the Department of Mental Health.

agencies assume the responsibilities of the local education agency under the IDEA. *See* State Plan, § XVII. With respect to the DCF, those circumstances are limited to situations where a child attends one of the schools that comprise USD # 2, which at times relevant to the complaint included Connecticut Children's Place, Riverview Hospital, High Meadows, and Long Lane. *See id.* ("the unified school district[ ] operated by the department of children and families ... provide[s] direct educational services to children requiring special education and are treated as LEAs for all purposes of the general statutes and regulations."); Conn. Gen.Stat. § 10–15d.

 "A district court's power extends to ordering non-educational public agencies to provide a disabled child with special education services, if such agencies are obligated to provide those services under state or federal law, or pursuant to an interagency agreement." *J.B,* 990 F.Supp. at 69 (citing *Mrs. C.,* 916 F.2d at 75–76 (ordering the court to compel defendants DCYS, USD # 2, and the State Board of Education to provide a disabled child with a compensatory education)). However, apart from the children in its residential facilities, the DCF does not have ultimate responsibility under the IDEA for the education of other children simply because it provides certain services to them. *See* State Plan, § XVII. Other than those situations where a child is enrolled in one of the unified school districts, the school system in the town where the child resides is responsible for providing a disabled child with a free and appropriate education under the IDEA.[30] *See id.*

Further, it is not clear whether the services provided by the DCF to the plaintiff here were related services that must be provided under the IDEA. For example, while the mentoring programs organized by the DCF appear to have been helpful to the plaintiff, they may not be responsible for "enable[ing] a disabled child to remain in school during the day [or] provid[ing] the student with 'the meaningful access to education that Congress envisioned.'" *Cedar Rapids,* 526 U.S. at 73, 119 S.Ct. 992 (citation omitted). Moreover, even if they were related services, DCF clearly did not provide them in order to discharge any duty it had under the IDEA. That responsibility still lay with the Board, even though it may have indirectly benefitted from DCF's involvement.

The plaintiff cites Conn. Gen.Stat. § 17a–38 as the source of the DCF's duties to him under the IDEA. This provision provides that the DCF is responsible for developing or contracting for home-based treatment programs "designed to provide time-limited, home-based services to families where a child is in imminent danger of being removed from the home and placed in foster care, residential treatment or a psychiatric hospital setting." Conn. Gen. Stat. § 17a–38. However, the fact that the DCF has some statutory responsibility to provide home-based services to children faced with being placed in a residential facility does not necessarily lead to liability under the IDEA, a statute enacted to assure that children with disabilities receive a free and appropriate education. Further, the plaintiff does not point to any precedent that holds that the IDEA should be extended to hold agencies and other organizations which provide related services ultimately responsible as LEAs under that statute. Nor does the IDEA

---

**30.** There is one limited exception to this rule: where a child is in the custody of the DCF and an LEA cannot be identified because his or her parents do not reside in this state or because parental rights have been terminated. This is termed the "no nexus" situation. Here, the plaintiff is not and has never been in the custody of the DCF.

language itself provide any support for this position.

Finally, the fact that the DCF arranged for services that impacted the plaintiff's educational performance and abilities does not result in its being responsible for the child's education under the IDEA. Even if some of the services provided by the DCF would also qualify as "related services" under the IDEA, the fact that the DCF provided them does not make the DCF the LEA for the plaintiff, even though the West Haven Board of Education may have benefitted because it did not need to provide the services directly. Doing so would burden the DCF with the financial responsibility for providing an appropriate education to children assisted by its programs. It also may discourage state agencies like the DCF from providing support services for children whose education is subject to the IDEA.

Thus, the DCF did not violate the plaintiff's rights under the IDEA by refusing to provide certain services or developing a procedure through which such service could be provided. It cannot be responsible under the IDEA for providing related services to the plaintiff under the circumstances here, and the hearing officer was correct in dismissing the DCF as a party.[31]

Of course, this analysis does not leave the plaintiff here-or others similarly situated-without a remedy under the IDEA. If he believed that the related services were deficient, he could pursue his remedies against the Board, his LEA. Even though the Board may benefit at times from the involvement of the DCF, it still is ultimately responsible for compliance with the IDEA, including assuring that the related services are appropriate and properly delivered.[32]

### 5. Claims Against the DOE

In light of the conclusions above, the only remaining claim for relief directed to the DOE in the complaint is the plaintiff's request that the Court reverse the hearing officer's decision.[33] The DOE argues that it cannot be held responsible for any of the hearing officer's alleged errors, however. See Evans v. Board of Educ. of the State of Connecticut, B–87–005 (EBB) (D.Conn. Jul. 21, 1989) (holding that the DOE was not a proper party to the plaintiff's administrative appeal under the Education for the Handicapped Act); see also Mr. & Mrs. B v. Board of Educ. of the Syosset School Dist., No. 96–CV–5752(FB), 1998 WL 273025, at *4 (E.D.N.Y. Jan.15, 1998); Dorian G. v. Sobol, 93 CV 0687, 1994 WL 876707, at *3 (E.D.N.Y. Jan.28, 1994).

31. It also bears repeating that in this case, the West Haven Board of Education reached a settlement with the plaintiff. As the LEA, it was the party that was primarily responsible for providing the plaintiff with a free and appropriate education under the IDEA. The Court notes that this determination does not conflict with the hearing officer's conclusion that the Board was *not* responsible for certain programs, as she made that decision on the basis that they were not "related services" under the IDEA.

32. In his post-hearing memorandum, the plaintiff also claims that DCF violated the IDEA because its representatives failed to attend "family team" meetings, which may

mean PPT sessions. The plaintiff, however, provides no additional argument or fact to support this claim, except a Board exhibit from the due process hearing that contains notes dated November 10, 1993 which indicated DCF was not in attendance. *See infra* note 42. Based on the Court's conclusions with respect to DCF's responsibility under the IDEA, however, this lack of attendance did not violate the plaintiff's rights under that statute.

33. The Court nevertheless recognizes its authority to award other types of relief, given that the plaintiff has also requested any other relief that the Court deems appropriate.

■ The state education agency is a proper party to actions involving claims of systemic violations of the IDEA, as the DOE acknowledges. *See, e.g., Yamen v. Board of Education of the Arlington Central School District,* 909 F.Supp. 207, 210 (S.D.N.Y.1996). It is also an appropriate defendant when the plaintiff makes a claim that the defendants violated 42 U.S.C. 1412(6), whereby states are given supervisory responsibility over the local educational agencies. *See Jose P. v. Ambach,* 669 F.2d 865, 870–71 (2d Cir.1982) (holding that the state educational agency could be held responsible for violations of § 1412(6) of the EHA); *Gadsby ex rel. Gadsby v. Grasmick,* 109 F.3d 940, 952–53 (4th Cir. 1997) (holding that the State educational agency is liable under the IDEA if it does not ensure that the local education agency complies with the IDEA). A systemic claim is one which "implicates the integrity of the IDEA's dispute resolution procedures themselves, or requires restructuring of the education system itself in order to comply with the dictates of the [IDEA]." *Mrs. M. v. Bridgeport Board of Educ.,* 96 F.Supp.2d 124, 133 n. 12 (D.Conn.2000).[34]

■ Here, the plaintiff's complaint contains both an administrative appeal of the hearing officer's decision as well as systemic claims of IDEA violations. With respect to the systemic claims, the plaintiff alleges that (1) Connecticut dispute resolution procedures violate the IDEA because they did not allow him to join the DCF as a party to the administrative due process hearing, and (2) the lack of necessary interagency agreements should require a restructuring of the education system in this state. However, while these claims are systemic in nature, they do not present a viable case or controversy between the plaintiff and the DOE. The only relief sought by the plaintiff against the DOE under the IDEA is injunctive relief and reversal of the hearing officer's decision. Thus, as noted above, his request for injunctive relief is moot. Without any remedy available for his systemic claims, only his request to reverse the hearing officer's decision remains. However, "State Defendants are not liable for the decision, even though erroneous, on the part of an independent, impartial hearing officer. Liability may not flow from decisions over which State Defendants have no control and cannot legally influence." *Lillbask v. Sergi,* 117 F.Supp.2d 182, 192 (D.Conn.2000) (noting also that "any claim of legal error on the part of the hearing officer should procedurally flow against [the town] Defendants").

The Court recognizes that in certain situations, state defendants, including the State Board of Education, may be ordered by the district court to provide compensatory relief. *See Mrs. C.,* 916 F.2d at 75–76 (ordering compensatory education under § 504 of the Rehabilitation Act); *Burr,* 863 F.2d at 1077 (stating that the plaintiff was entitled to compensatory education under the IDEA in an action brought against the commissioner of the New York State Education Department); *Garro v. State of Connecticut,* 23 F.3d 734, 736–37 (2d Cir. 1994). However, here the plaintiff did not request such relief from the DOE. Even if he had, however, the claim would fail. In general, the IDEA applies to individuals who are twenty-one years of age or younger; however, as mentioned above, reimbursement in the form of compensatory

---

**34.** The plaintiff does not appear to allege that he or his family were unable to participate fully in the development of the IEP, *see Walczak,* 142 F.3d at 129; nor does he question the impartiality of the state hearing officer who presided over his due process hearing. *See Heldman,* 962 F.2d at 151.

education is available to a claimant over the age of twenty-one when he has suffered "gross" procedural violations. *See Mrs. C.,* 916 F.2d at 75. The plaintiff is over twenty-one. Because he has not shown by a preponderance of the evidence that he has suffered any "gross" procedural violations, his claim for compensatory education must fail.

Further, even if the plaintiff's claims for injunctive relief were not moot, he is not entitled to such relief on the merits. A court reviewing a hearing officer's decision concerning an IEP considers two fundamental issues: "(1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak,* 142 F.3d at 129 (quoting *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034). The first inquiry "will require a court not only to satisfy itself that the state has adopted the state plan, policies, and assurances required by the Act, but also to determine that the state has created an IEP for the child in question which conforms with the requirements of § 1401(19)." *Rowley,* 458 U.S. at 206–07 n. 27, 102 S.Ct. 3034. State educational agencies may meet federal requirements in a number of ways, including the adoption of a "[s]tate law, regulation, or policy designat[ing] the [state educational agency] as responsible for establishing standards for all educational programs for individuals with disabilities, and . . . monitoring [those programs]." 34 C.F.R. § 300.600 n. 3; *see also Naugatuck Board of Educ. v. Mrs. D.,* No. Civ. 3:95CV1782(AHN), 1997 WL 205791, at *3 (D.Conn. April 17, 1997).

Here, the State of Connecticut has implemented its State Plan, which was approved by the United States Department of Education for fiscal years 1996–1998. Such evidence is "highly persuasive." *Lillbask,* 117 F.Supp.2d at 192. That plan provides that it is the policy of the DOE to "develop and implement interagency agreements with any State or local education agency, whenever such action is deemed to be necessary to ensure the provision of a free and appropriate education," *see* § XVII, and also identifies procedures for determining financial responsibility under any agreement, and also specifies how disputes over alleged violations of the IDEA should be addressed. *See Naugatuck,* 1997 WL 205791 at *3 (considering the contents of Connecticut's state plan as evidence that the statutory scheme meets the requirement of the IDEA).

Based on this evidence, the Court concludes that the DOE has not violated the IDEA by failing to provide additional rules or procedures whereby services could be identified and provided through the use of interagency agreements. It has established such procedures for students within USD # 2, where the DCF acts as the local education agency. The DOE need not develop specific rules and procedures requiring the DCF (as an LEA) to provide services for children in the public schools where the DCF is not responsible for providing such children with an appropriate education. The fact that the state's plan does not include an interagency agreement for students like the plaintiff who have not been placed in a residential facility does not violate the IDEA or its accompanying regulations, and the state has complied with the mandates of the federal law. Further, the state's actions demonstrate that it has complied with its duty to ensure that each educational program for children with disabilities administered within the State, including programs administered by other state agencies, meets the educational standards set forth in the state plan. *See* 20 U.S.C. § 1412(6); 34 C.F.R.

§ 300.600(a). Also, the state is simply not required to develop interagency agreements to assure that students like the plaintiff are kept out of residential facilities. The state's responsibility is to assure that children receive a "free appropriate education" through LEAs, and to the extent possible, one in the least restrictive environment. This does not require the state to always seek to prevent children from being placed in residential facilities, when such a placement is otherwise appropriate.

 Plaintiff also claims that the DOE violated 34 C.F.R § 300.556 by failing to monitor the local educational agency, in this case the West Haven Board of Education, to ascertain whether it meets the other requirements of the section. However, the state has complied by establishing a due process hearing procedure whereby any given IEP can be challenged and changed. Further, as noted above, the federally-approved state plan is clear on this point: the LEA has the primary responsibility to assure that children receive an appropriate education. Finally, as the defendants point out, the IDEA contains no requirement that children with disabilities be educated beside non-handicapped children; it contains instead a " 'mainstreaming' preference." *Rowley*, 458 U.S. at 202–03, 102 S.Ct. 3034. In fact, states must provide education in the least restrictive environment "to the maximum extent appropriate." 20 U.S.C. § 1412(5). Thus, the plaintiff has not shown by a preponderance of the evidence that the DOE has violated the plaintiff's rights under the IDEA.

**B. *Claims against the DOE and the DCF under the ADA***

**1. *The ADA in General***

The plaintiff claims that the defendants violated the ADA by refusing to provide individualized support services unless the plaintiff was transferred to a residential placement. Although the complaint is not clear on this point, the Court assumes that this claim pertains to the nature and extent of the services provided the plaintiff through DCF and to the DCF's discontinuation of its services in 1997.

 The ADA provides, in part, that "no qualified individual with a disability, shall, by reason of the disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. This requirement is contained in Title II of the ADA, which prohibits discrimination by public entities against qualified individual with a disability in the benefits or activities of the public entity.[35] Recently, however, the Second Circuit held that in enacting Title II of the ADA, Congress exceeded its power under § 5 of the Fourteenth Amendment and therefore, failed to validly abrogate Eleventh Amendment immunity. *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, No. 00–9223, 2001 WL 1159970, at *9 (2d Cir. Sept.26, 2001). But, "a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability."[36] *Id.* Here, the plaintiff demands injunctive relief from both defendants, which is not affected by the court's ruling

---

**35.** In contrast, Title I deals with employment discrimination and Title III with discrimination in public accommodations.

**36.** Before *Garcia*, deliberate indifference was required to show intentional discrimination under the ADA. *See Garcia, 2001 WL 1159970 at *11.*

in *Garcia*.[37] *See id.* at *12; *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 374 n. 9, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (holding that although Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I of the ADA, those standards can be enforced by private individuals in actions for injunctive relief under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Therefore, the plaintiff need not show discriminatory animus or ill will due to disability, as this is the standard when a damages claim is involved.[38]

### 2. *Claims against the DOE and the DCF*

▪ The plaintiff claims that the DOE and the DCF violated the ADA by offering to provide certain services through the DCF only if the plaintiff agreed to placement in a residential facility rather than in the West Haven public school system, and the Court assumes that this allegation also relates to the discontinuation of services by the DCF in 1997. In particular, he contends that this policy violates the regulations that accompany the ADA, which direct that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). According to the plaintiff, the fact that the DCF finances food, shelter, education, health care, counseling and medication for children who are in residential facilities, but not for children who remain in the home,

demonstrates that the DCF has violated the ADA.

It appears that the plaintiff can no longer maintain this claim under the ADA. As discussed above, any claim for injunctive relief against the DOE has been mooted by the fact that the plaintiff can no longer benefit from any procedural change enacted by the DOE, given that he is no longer receiving educational services. Further, as to the DCF, it is not clear whether compensatory educational services is an appropriate remedy under the ADA, particularly since the DCF is not an LEA in this case and therefore cannot be ordered to provide compensatory educational services under the IDEA.

▪ However, even when the claim against the DCF is considered on its merits, the Court concludes that the plaintiff has not proved that it violated the provisions of the ADA.[39] To establish a violation of Title II of the ADA, the plaintiff must prove: "(1) he or she is a qualified individual with a disability; (2) he or she is being excluded from participation in or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program, or activity is a public entity." *Messier v. Southbury Training Sch.,* No. 3:94–CV–1706, 1999 WL 20910, at *8 (D.Conn. Jan. 5, 1999) (quotation omitted). In the special education context, courts have imposed an additional requirement: to prove a violation of the ADA, a plaintiff must demonstrate more than an incorrect evaluation or substantively faulty IEP-he must show that

---

**37.** Relief in the form of compensatory education is equitable and prospective in nature. *Garro,* 23 F.3d at 736; *Board of Educ. v. Illinois State Bd. Of Educ.,* 79 F.3d 654, 656 (7th Cir.1996); *Parents of Student W. v. Puyallup School District,* 31 F.3d 1489, 1497 (9th Cir.1994).

**38.** Nevertheless, the Court also finds no evidence of discriminatory animus or ill will.

**39.** For the purposes of such an analysis, the Court will assume that the plaintiff is disabled within the meaning of the ADA.

defendants acted with bad faith or gross misjudgment. *See R.B. v. Board of Educ.*, 99 F.Supp.2d 411, 419 (S.D.N.Y.2000) (citing cases) (noting also that a plaintiff need not show that the defendants acted with animosity or ill will).

First, the plaintiff has not shown that he is "otherwise qualified" within the meaning of the ADA.[40] The plaintiff essentially alleges that he was treated differently than those children who are in the residential care of the DCF because he did not receive the same level of services provided to them. However, the purpose of statutes such as the Rehabilitation Act and the ADA is to eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the non-disabled. *See Southeastern Comm. College v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); 45 C.F.R. § 84.1 (Rehabilitation Act); 28 C.F.R. § 35.101(ADA). In contrast, the plaintiff asks the Court to compare his treatment to that of certain other disabled individuals-those who receive services in segregated or residential facilities. However, "[t]he Rehabilitation Act does not require all handicapped persons to be provided with identical benefits." *P.C. v. McLaughlin*, 913 F.2d 1033, 1041 (2d Cir. 1990). Here, plaintiff's claim, as well as the evidence presented, supports the notion that he received benefits that were different that those provided to children in residential facilities, but this fact alone is not enough to support a claim under the ADA.

Further, as the Second Circuit noted in *Doe v. Pfrommer*, 148 F.3d 73 (2d Cir. 1998), it is difficult to apply the typical "otherwise qualified" analysis when the only reason that the plaintiff was eligible for the service or program at issue is that he was disabled. In *Doe*, the court stated:

We have previously recognized that where the handicapping condition is related to the benefit provided, it will rarely, if ever, be possible to say with certainty that a particular decision was discriminatory.... [T]he question of who is otherwise qualified and what actions constitute discrimination under § 504 would seem to be two sides of a single coin; the ultimate question is the extent to which a grantee is required to make reasonable modifications in its programs for the needs of the handicapped..... The appropriate focus in the case before us, therefore, is not whether [the plaintiff] is otherwise qualified for ... benefits, but the extent to which the defendants are required by the anti-discrimination statutes to modify their programs to meet all of [the plaintiff's] needs as a disabled individual..... [N]either the ADA nor the Rehabilitation Act establish an obligation to meet a disabled person's particular needs vis-a-vis the needs of other handicapped individuals, but mandate only that the services provided ... to non-handicapped individuals not be denied to a disabled person because he is handicapped.

*Doe*, 148 F.3d at 83 (citations omitted). The plaintiff does not allege, nor present any evidence, that he was treated differently than any non-disabled individual. Instead, the evidence shows that the DCF modified its program several times to meet the needs of the plaintiff. For example, it added medical monitoring as part of his program when it was requested by the plaintiff's mother. Further, it tailored the mentoring and counseling activities to meet the needs of the plaintiff and his family as expressed in the family planning

**40.** The DOE is clearly a public entity within the meaning of the ADA.

group meetings. In short, the Court finds that there is no evidence that either the DOE or the DCF acted with any bad faith or gross misjudgment. *See R.B.*, 99 F.Supp.2d at 419. Perhaps the plaintiff did not receive the same services as he would have received had he been admitted to a residential facility, but the evidence shows that the DCF expended substantial funds on behalf of the plaintiff when he was participating in the NCTP. Not only were he and his family provided with various kinds of counseling, he also enjoyed medical care and recreational activities through the DCF. The Court finds that his programs were reasonably tailored to meet his needs.

## C. *Rehabilitation Act Claim against the DCF*

The plaintiff claims that the DCF violated § 504 of the Rehabilitation Act in November and December 1993 by terminating or failing to commence services because he pursued his claims under the IDEA. In his post-trial brief, the plaintiff characterizes this count as a retaliation claim.

Section 504 of the Rehabilitation Act guarantees that "no otherwise qualified individual with a disability, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). While actions for money damages under the Rehabilitation Act are most likely foreclosed, *see Garcia*, 2001 WL 1159970 at *11 (holding that the plaintiff's § 504 damage claim against New York fails because the state did not waive its sovereign immunity from suit), actions for injunctive relief are still possible, *see id.* (holding that deliberate indifference still remains the necessary showing for § 504 claims).

In order to establish a violation of § 504 of the Rehabilitation Act, a plaintiff must show essentially the same elements required under the ADA, *see Doe*, 148 F.3d at 82, though § 504 covers entities receiving federal financial assistance. *Messier*, 1999 WL 20910, at *8 n. 7. More particularly, "[t]he elements of a claim for retaliation under Section 504 . . . are: (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that the plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Board of Educ. of the City of New York*, 97 CIV. 9367(DAB), 2000 WL 1100395, at *4, (S.D.N.Y. Aug. 7, 2000) (citing cases).

As with the plaintiff's claims under the ADA, it appears that he can no longer maintain a claim under the Rehabilitation Act. While a plaintiff may enforce his rights under the IDEA through a § 504 claim, *see Mrs. C.*, 916 F.2d at 75–76, it is not clear whether compensatory educational services is an appropriate remedy under the Rehabilitation Act as well. Further, the plaintiff has not produced evidence to show the elements of a claim under the Rehabilitation Act (including that the DCF received federal funding), which, as noted above, are essentially the same as those which must be proven under the ADA.

As to the retaliation aspects of his claim, the plaintiff apparently claims that he engaged in a protected activity when he filed for due process, and that the DCF was aware of the fact that he did so when he attempted to join the DCF as a party to the hearing. He alleges that the DCF discontinued his application for its services in response to his pursuit of an administrative appeal under the IDEA. The facts

found by the Court do not support this claim, and the Court specifically finds that the DCF did not discontinue his services because the plaintiff filed for due process.[41] Assuming both that filing for administrative due process is a protected activity and that DCF personnel was aware of this fact, the evidence does not show that the DCF discontinued his application, terminated any services, or failed to provide services in response to his exercise of his due process rights. Mrs. Fetto did testify that she got the impression after a November 3, 1993 meeting with DCF staff that DCF would not provide "wrap-around" services while the Fettos were in due process, and that DCF case manager Lisa Spruill told her over the telephone prior to November 10, 1993 that the DCF had accepted the case but would not take an active role until the due process decision was reached.[42] However, the evidence shows that DCF took a variety of steps towards providing services prior to the conclusion of the due process hearing. The first DCF staff member to work with the plaintiff was assigned to his case on October 14, 1993, five days after the due process hearing began on October 8, 1993. An October 28, 1993 letter from Letitia Lacomba, a social work supervisor with the DCF, to Peter Florio, the pupil personnel director for the West Haven Board of Education, indicates that the DCF was at that time working to organize services for the plaintiff under the NCTP. DCF's Case Activity Notes show this as well. In addition, a December 2, 1993 memo from Ms. Lacomba to Ralph Arnone, a program supervisor at the DCF, about the plaintiff's case, states that "It is this Department's position at this time to proceed in arranging for 'wrap-around services' for the time periods occurring before and after school. This Department will pay for these services at this time and seek reimbursement at a later date." Further, Mr. Garrison testified that after a December 12, 1993 meeting with DCF staff and a community provider of services, he and the Fettos felt that there were no major obstacles to getting to the services requested from DCF. He also stated that before the hearing officer's decision, DCF made referrals to an outside agency, Priority Care, and began to provide some services. The evidence also indicates that the DCF provided a variety of services to the plaintiff for several years, including time when he was pursing this action in federal court. Thus, the plaintiff has not shown that he was denied any services because he pursued an administrative appeal of the hearing officer's decision. Accordingly, the plaintiff has not proved his claims against the DCF under the Rehabilitation Act.

41. While federal regulations provide that individuals shall not be subject to retaliation for participating in administrative or judicial proceedings under the ADA, the Rehabilitation Act, and certain other civil rights statutes, they do not refer specifically to the IDEA. *See* 29 C.F.R. § 1614.101. However, the analysis here assumes that the IDEA would also be included.

42. The administrative record from the due process hearing also includes a document containing notes, entitled "IEP Addendum," which is dated November 10, 1993. These notes state the following:
DCF no longer involved at this time

— Ralph Arcone, Reg. Coord.
— Hearing scheduled for Dec. 3.
. . .
— DCF has accepted case, but will not take active role until due process decision is reached
(Ex. B–115). Notwithstanding authentication issues which arise with respect to this document, these notes do not provide evidence sufficient to show that the DCF terminated services in retaliation for the fact that the plaintiff pursued a due process hearing; the Court does not find that the plaintiff has proved this point by a preponderance of the evidence.

### D. *Constitutional Claims Against the DCF* [43]

■ The plaintiff also claims pursuant to 42 U.S.C. § 1983 that the DCF violated his procedural rights under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution. He argues: (1) that the DCF failed to provide a procedure through which the plaintiff could apply for educational and family support services in the school and in the family home setting; (2) that the DCF terminated his services in the midst of his treatment plan; and (3) that the DCF failed to continue to provide benefits during the pendency of the administrative appeal to the DCF. Because relief in the form of compensatory education is equitable and prospective in nature, *see Garro*, 23 F.3d at 736 (stating that it is prospective relief); *Board of Educ.*, 79 F.3d at 656 (explaining that the IDEA permits a full range of equitable remedies, including compensatory education); *Parents of Student W.*, 31 F.3d at 1497 (referring to compensatory education as an equitable remedy), DCF's argument that the § 1983 claim must fail because state officials acting in their official capacities are not persons under § 1983 and therefore cannot be sued for damages under that statute is inapplicable here, where the plaintiff requests only compensatory educational services. Under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Eleventh Amendment does not bar suits seeking prospective relief against state officials acting in violation of federal law because such action is not considered an action of the state.[44]

■ The right to procedural due process requires that " 'deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.' " *Logan v. Zimmerman Brush Co.* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). A plaintiff asserting a procedural due process claim must show: (1) that he had a property right; (2) that the state deprived him of that right; and (3) that the deprivation was effected without due process of law. *Local 342 v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir.1994).

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.... Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

---

**43.** The DCF argues that the plaintiff's due process claims should be struck for failure to allege a statutory "vehicle" through which they could be asserted. However, paragraph 2 of the plaintiff's complaint alleges jurisdiction based upon 42 U.S.C. § 1983. Accordingly, this requirement is satisfied.

**44.** The Court was not able to locate any published decision that explicitly ruled that compensatory education is an appropriate remedy for a § 1983 claim based on 14th amendment

violations rather than on violations of the IDEA. However, § 1983 allows for relief "in an action at law, suit in equity, or other proper proceeding for redress." *Cf. Donahue v. Staunton*, 471 F.2d 475, 483 (7th Cir.1972) ("[I]t is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." (citation omitted)).

*Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). For example, an individual receiving federal benefits under statutory and administrative standards that define eligibility has a property interest in receiving those benefits, and that interest is safeguarded by procedural due process. *See Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (Social Security disability benefits). "Whether a plaintiff has a clear entitlement to a benefit is determined primarily by examining the degree of discretion afforded to the entity dispensing the benefit." *BD v. De-Buono,* 130 F.Supp.2d 401, 431 (S.D.N.Y. 2000) (citations omitted); *see also Colson v. Sillman,* 35 F.3d 106, 108 (2d Cir.1994). "An entitlement to a benefit arises only when the discretion of the issuing agency is so narrowly circumscribed as to virtually assure conferral of the benefit." *Gagliardi v. Village of Pawling,* 18 F.3d 188, 192 (2d Cir.1994)(quotation omitted).

 As to the "property interest" involved in this case, even though the plaintiff had a protected property right to an appropriate IEP under the IDEA, *see* B.D., 130 F.Supp.2d at 431, the DCF is not the proper party against whom this right should be asserted, as the DCF was not the LEA responsible for providing the plaintiff with a free, appropriate education under the IDEA. Permitting such claims against non-LEAs would render the IDEA scheme meaningless, as it would permit any outside agency or group to be held responsible for the plaintiff's right to an IEP under the IDEA through the use of § 1983 as an alternative to the IDEA. Accordingly, it is more appropriate to characterize the relevant property right asserted against the DCF as the right to the services provided by the DCF as part of the NCTP.

In general, the plaintiff did not have a legitimate claim of entitlement to services through the NCTP. The NCTP was intended for situations in which the child was not legally committed to DCF but was in need of residential care, day treatment, or other out-of-home-placement. *See* Conn. Agencies Regs. § 17a–90(b)–1. Under the program, the DCF would pay for the child's residential care and services without the family having to surrender custody of the child. *Id.*[45] The services provided by the DCF to the plaintiff do not fit this model. In the plaintiff's case, the DCF extended the NCTP by providing him with services in the community, an act which was a discretionary one. Thus, this is not a case where, as the result of narrowly-circumscribed discretion, the issuing agency's approval was "virtually assured." *Gagliardi,* 18 F.3d at 192.

Nevertheless, the DCF provided the plaintiff and his family with a Family Treatment Plan dated October 30, 1996, outlining the services it would offer.[46] Based on this document, the plaintiff arguably had a legitimate claim of entitlement to those services, as there appeared to be a mutual understanding that they would be provided to him, at least during the six-month period of time the Family Treatment Plan was in effect. Accordingly, the Court will analyze whether the actions tak-

---

**45.** While the eligibility requirements for the NCTP were clearly set forth in the regulations, *see* Conn. Agencies. Regs. § 17a–90(b)–4, financial assistance and social services were provided "at the discretion of the Commissioner." *See id.* at § 17–411–2.

**46.** The DCF had provided these plans to the plaintiff and his family roughly every six months since the plaintiff began receiving services from the agency.

en by DCF violated the plaintiff's due process rights.

When alleged violations of procedural due process are reviewed, the Supreme Court has distinguished between claims based on established state procedures and claims based on random, unauthorized acts by state employees. *Hellenic Amer. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir.1996). As to cases in the latter category, the Supreme Court has recognized that "the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *see also Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Thus, "the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion" where there exists an adequate postdeprivation remedy and "competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical." *Catanzaro v. Weiden*, 188 F.3d 56, 63 (2d Cir.1999). In other words, "[i]n cases where a plaintiff challenges the random acts of state employees ... 'the Due Process Clause of the Fourteenth Amendment is not violated ... so long as the State provides a meaningful postdeprivation remedy.'" *M.H. v. Bristol Board of Educ.*, No. 3:98CV867, 2001 WL 1111075 (D.Conn. Aug.29, 2001) (quoting *Hellenic*, 101 F.3d at 880).

However, in cases where established state procedures are implicated, the existence of a postdeprivation procedure may not be sufficient for procedural due process purposes. *Alexandre v. Cortes*, 140 F.3d 406, 411 (2d Cir.1998). Instead, the court must weigh: "(1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 164 (2d Cir.2001) (quoting *Mathews*, 424 U.S. at 335, 96 S.Ct. 893).

One of the plaintiff's due process claims-that the DCF failed to continue to provide benefits during the pendency of the administrative appeal-is properly characterized as involving random acts of DCF employees, as it concerns actions taken allegedly in violation of DCF policy. *See Hellenic*, 101 F.3d at 881 (analyzing plaintiff's procedural due process allegations as involving random, unauthorized acts where the plaintiff made "no claim that the due process violation was caused by an established state procedure," but instead that the state officials at issue "acted in flagrant violation of the City Charter and [Procurement Policy Board] Rules"). DCF regulations provide that services continue during an administrative fair hearing if the recipient requests such a hearing within ten days of receiving the notification. *See* Conn. Agencies. Regs. § 17a–90–7.[47] Here, although the Fettos made a

---

**47.** Section 17a–90–7 of the Regulations of

Connecticut State Agencies provides:

timely request, no services were provided after January 22, 1997. However, the evidence shows that DCF did not take affirmative steps to discontinue services. Instead, Mrs. Fetto told Mr. Harmon that she could not afford to pay for his services, and it appears most likely that the DCF failed to assure that Mr. Harmon's services continued during the pendency of the appeal. This action-or inaction-is properly characterized as random, given that it did not occur pursuant to established DCF procedures. As such, the fact that the plaintiff was provided with a postdeprivation remedy in the form of a DCF administrative hearing in which he could have raised this issue, and the fact that he has not shown by a preponderance of the evidence that this remedy was not meaningful, indicates that his due process rights were not violated.

 However, even if the alleged procedural due process violation involved in this claim was not considered random and unauthorized, it cannot succeed. Given that the only property right possibly involved is the right to services as a result of the Family Treatment Plan, the plaintiff can only claim that he was deprived of services for the length of time that plan was to be in effect, or roughly six months. The plaintiff has not shown that he suffered any particular harm as a result of the fact that he did not receive services from DCF for that period of time. Ac-

cordingly, even if a procedural due process violation under *Mathews* is assumed, the plaintiff has not proved by a preponderance of the evidence that he is entitled to any relief for that violation.

 The plaintiff's other two procedural due process claims clearly implicate established state procedures, and thus are analyzed using the *Mathews* factors. To the extent that he claims that the DCF terminated his services in the midst of his treatment plan, the relevant private interest is in the uninterrupted receipt of DCF services pending final administrative decision on his claim. *See Mathews*, 424 U.S. at 339, 96 S.Ct. 893 (holding that the private interest in plaintiff's social security disability benefits is characterized as the right to uninterrupted receipt of this source of income pending final administrative decision on the plaintiff's claim). However, the DCF procedures do not allow for a great risk of erroneous deprivation of this interest, absent a random and unauthorized act described above. The plaintiff was provided with notice of the proposed termination, information concerning procedures to contest the decision, and an opportunity to be heard through the administrative appeals process, and thus it is unclear what additional procedural safeguards were needed or could have been provided. *See Logan*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265. The plaintiff and his family did not raise this issue

In those cases where the client seeks to have benefits continue pending a Fair Hearing decision, the following will apply:
(a) The request for a hearing must be signed by the client and postmarked within ten (10) days after the date the worker mails the notice of proposed action.
(b) In no instance will the benefit continue if the hearing is not requested within the ten (10) day period.
(c) All recurring benefits, subsidies or payments are subject to continuation pending a Fair Hearing decision.

(d) If the Fair Hearing decision upholds the Department and the benefit is continued beyond the date of eligibility, the client may be required to reimburse the Department based on such factors as the client's ability to pay and/or the circumstances of the overpayment. Notice of this requirement will be provided to the client prior to the Fair Hearing.

during the administrative hearing. As a result, the plaintiff has not shown that he was deprived of procedural due process.

Finally, the plaintiff's claim that the DCF failed to provide a procedure through which the plaintiff could apply for educational and family support services in the school and in the family home setting also must fail, even assuming that the plaintiff had a property right in such services. First, as stated above, it is difficult to imagine his legitimate claim of clear entitlement to discretionary services under the NCTP. Second, it appears that appropriate procedures were available to him. Section 17a–90(b)–3 of the Regulations of Connecticut State Agencies sets forth the application procedure for the NCTP, which involved contacting the DCF office servicing the applicant's town of residence, submission of certain written reports, a financial affidavit, and a release of information. This regulation thus provided a procedure for applying for NCTP services, and presumably, this procedure used by Mrs. Fetto in 1993, when she first contacted the DCF. Further, it appears that an alternative was available. To the extent that the plaintiff claims that he was entitled to a DCF procedure whereby he could apply for educational services, the IDEA provided him with such a mechanism and it was the Board's responsibility to assure that such services were provided, even if offered by an outside agency or other organization. While the plaintiff's program may have suffered from a certain lack of coordination, the responsibility for that organization must be placed with the local school district, not with the DCF. Permitting individuals to seek educational services as well as "wrap-around" services not characterized as related services under the IDEA through IDEA procedures would impermissibly expand that statute, resulting in increased fiscal and administrative burdens on states. Thus, the plaintiff's procedural due process claim must fail.

### Conclusion

For the reasons stated above, the Court concludes that the plaintiff has not proved by a preponderance of the evidence that the defendants violated the IDEA, ADA, Rehabilitation Act, or the Due Process Clause of the Fourteenth Amendment.